Good morning, Your Honor. My name is George Verdelia. I represent the estate of Irene Richardson. Morning, Counsel. Morning, Your Honors. David Epstein for the affilies, the plaintiffs in the circuit court. Good morning, Counsel. And just so we're clear, there is a cross-appeal here. I'm not sure of the protocol, whether I ought to or can reserve time on the rebuttal on the cross-appeal. I will live with whatever is the court's pleasure. Well, you can, but why don't we just see how the argument goes. Thank you, Your Honor. Whenever you're ready, Counsel. I am ready now, Your Honor. Thank you. I would like to reserve five minutes for rebuttal. May it please the Court, Counsel. In order to affirm, one must ignore at least four things. One must ignore the judicial admissions of these plaintiff lawyers in the underlying divorce case, in their sworn affidavits, and in their petition for fees, in which they described their agreement with Irene Richardson and never once mentioned any agreement for the payment of interest on the fees. Second, one must ignore clear public policy at the time. Don't they say that she did? They did discuss that, and she's the one who came up with the idea? They do say, number one, that they did discuss it, and that she came up with the idea. But these sworn affidavits were filed after. Oh, I misspoke. No, no. It was a fair question, Your Honor. But they were filed after this alleged agreement occurred. They made no mention of it. Second, you must ignore clear public policy that such must ignore that they did not at trial rebut the presumption that any agreement was the product of undue influence between lawyers and a client who was clearly in a vulnerable position. Fourth, one must ignore the jury's combining of two calculations that are irreconcilable in order to reach their verdict. As I started to mention, in the underlying divorce case, Mr. Richardson's lawyers asked Mrs. Richardson's lawyers, these plaintiffs, to set forth their agreement because in divorce proceedings, Mr. Richardson could not be compelled to pay Mrs. Richardson's fees unless she was obligated to pay her lawyers those fees. So they had to set forth their agreement with her so that he would understand what potentially he was obligated to pay. Counsel, she received a series of bills from these lawyers over a period of time. The interest that they were charging was clearly stated on those bills, wasn't it? She did receive statements sporadically. Sometimes five years lapsed between the receipt of statements. I think what my point is, didn't those statements contain some memorialization that the lawyers at least thought she owed them interest? And she never raised any kind of objection to that, did she? Right. That's correct. There were some statements that did was that those statements contained interest because her lawyers intended to ask Mr. Richardson for interest. That's what they intended to do. They never asked her to pay a dime of fees or interest in submitting those statements to her. So the deal was, if he has to pay, interest applies, but if I have to pay, interest doesn't apply. I mean, you get my drift? That's kind of the way it seems. It was her testimony and it was the fact of how they were proceeding, the divorce proceeding, that they intended to ask Mr. Richardson to pay interest, yes. But they did not intend to ask Mrs. Richardson to pay interest. And they never set forth in any sworn statement that their agreement with Mrs. Richardson included the payment of interest by her. Wasn't there, and correct me if I'm wrong, but sometime like around 1895 or so, there was a petition filed and in that petition, interest was indicated? Yes, and I'm glad you brought that up because in that, that was Defendant's Exhibit 5. And in that amendment to fee petition, which raised for the first time interest, asking Mr. Richardson to pay interest, they didn't say that Mrs. Richardson had agreed to pay that the interest should be paid as a matter of equity by Mr. Richardson. They never said in that fee petition, in that amendment to the fee petition, that they had a deal with Mrs. Richardson that she was going to pay interest. That was not a part of that petition. When was that first mentioned? Interest at all was first mentioned in court in the divorce proceeding in that amendment to the fee petition in 1995. And the alleged oral agreement with Mrs. Richardson occurred by their testimony in November of 1990. After the first trial, right? Correct. In other words... After the first hearing, right. I can't afford to pay you now, but I'll pay you later and I'll pay you 9% interest. That was their testimony. That was their testimony. Okay. And the jury heard that? The jury did hear that, absolutely. Go ahead. I'm sorry. We have covered my points that I was going to make on the contract. Let me ask you something about the interest. Your point that the interest was due if Mr. Richardson was paying the fee, but it wasn't due if Mrs. Richardson paid the fee. Do you think there's any public policy issue with that position? When you talk about the issue about public interest, some of your arguments have a public policy underpinning. Do you think that's against public policy that the interest is only due if somebody else, if the husband is paying it, but it's not due if the wife is required to pay it? I don't think that there's a public policy problem the way they did it in the divorce court, which was to ask the court to award interest out of a sense of equity, that kind of argument. Whether the court should have done so or not is a different matter, but I don't think that's a public policy concern. I do think it's a public policy concern for them to never claim in a divorce proceeding that they had an agreement with their client and now claim that they did. Well, that's a different question. That's not the one I asked. Okay. Well, in her testimony of record, she knew that interest was being applied on the fees. She knew she was getting statements that reflected interest sporadically. And she went on further and testified, but it was her belief, the word she used, her belief, that it was only being charged to her husband. That's correct. Okay. And it appears to me, based upon the little that I know about this, your client seems to be a pretty sharp woman. She headed up this corporation. She never headed a corporation. As a secretary or a finance person. Don't deny that she was an intelligent woman. The cases make it very clear that as the class in and in cases make clear, the fact that the client is intelligent does not excuse the lawyer from that burden. I think she was pretty well attuned to business relationships and business science. What's the rational basis for her to have this belief that only her husband was being charged the interest and not her? She was told that by her lawyers. She knew interest was running up on her. She was told that by her lawyers. Her lawyers told her, we're going to seek interest from your husband. Exclusively from the husband. That's what they told her. That's in the record. It is. But the jury already heard that and they didn't believe that. They didn't accept that. So we're a court of review. Are we supposed to say the jury didn't believe it but we do? Well, as to the factual issue of whether there was an agreement or not, we believe it was against the manifest way of the evidence of the finding based on these admissions, judicial admissions by the lawyers in the underlying divorce proceeding that they described their contract. I'm not getting that part of your argument at all. There was a bill of particulars that the lawyers filed in the underlying divorce proceeding describing to Mr. Richardson's lawyers what the terms were of their agreement with Mrs. He would know what he was potentially liable for if he had to pay her fees. That sworn bill of particulars was presented after they alleged this agreement was entered into. They did not anywhere in that bill of particulars, which was Defendant Exhibit 42, set forth that Irene Richardson had agreed to pay any interest. Nowhere. But how does that negate the jury hearing their testimony, hearing her testimony, and resolving that conflict in a factual statement in the plaintiff's favor? I'm still not understanding how the bill of particulars, how does that negate the jury's finding that the lawyers were telling the truth and your client was not? Well, we believe that the statements that they made when they had every motivation to put interest in there if, in fact, there was an agreement but didn't do so is far more weighty evidence than their testimony in front of this jury now when they had every motivation to testify to the contrary. Let me move on to the undue influence aspect and the related issue of the jury instruction. This was a transaction between lawyers and their client at a time she was very vulnerable. She had just lost a very important hearing. She was facing loss of everything. And even if you believe every word that they say, that she came up to them and said, I'll pay you 9% interest, they still, as a matter of law, have the obligation to rebut the presumption that this agreement was the product of undue influence. And there are three elements as set forth in the jury instruction. One, that the contract was fair. Two, that the contract was not the product of undue influence. And three, that Mrs. Richardson had independent advice. Had independent advice is key. And the jury, excuse me, the court modified that IPI jury instruction to say, had independent advice or had the opportunity to have independent advice. It nullified all of the case law that says that the standard is, had independent advice. The reason for that. Counsel, are you contending that a client who is in a relationship with a lawyer, every time he or she gets a billing statement or with respect to the billing agreement that he or she makes with that lawyer, they should take it to a, you know, a third party to review whether it's fair? Is that your argument? Not every statement. When there is a change in the business relationship, while there is a representation of that client, yes. So if you represent the client during the trial phase, and then you're going to represent the client on appeal, and your rates are different because, you know, the work is different, your argument is that client should then find a third party to review whether or not her lawyer is making a reasonable deal or whether that's a fair agreement. Is that your argument? Yes. And the reason is because you are in a fiduciary relationship with that client because you are representing them in case, in a situation in which they are seeking your advice. And you feel that is the case, notwithstanding the fact that if you accept, if you accept the testimony of these plaintiffs at trial, the whole scheme, the whole idea of the 9 percent interest started with the client, not with them. And the case is very clear, the ending case is very clear that the fact that the client suggested it is irrelevant. The lawyer still has an independent fiduciary obligation to that client to protect the client from herself. That's the concept of a fiduciary. Just as if a beneficiary of a trust went to a trustee and said, I want $100,000 to invest in a penny stock. Now, maybe that's a good idea, maybe it's a bad idea, but the trustee doesn't get off the hook if he does that, simply by saying, well, the beneficiary wanted that. Because it's the fiduciary that has the obligation to protect the client from herself. Well, why is the additional language in the jury instruction so repugnant? I mean, was the lawyer forced in some manner? Was the lawyer required to force her to get a second opinion? In this circumstance, the lawyer was required. Because unless you have a gun pointed at one's head in the context of the agreement, you will always have the opportunity to get advice. The question is whether or not you had independent advice. That's why the instruction is written that way. The lawyer was required to say to her, now, Mrs. Richardson, you should go to a third party and find out and ask them whether this is a reasonable thing for you to propose to me. Yes. That's your argument? Yes, absolutely. And the Monco case, for example, further to your point, the lawyer there advised the client to get independent advice. The client didn't do so. The court there found that that was insufficient because the client so trusted the lawyer that it didn't matter simply that the lawyer recommended that the client get independent advice. It found that the standard was that the client had to have had independent advice and found that it was lacking there even when the lawyer did recommend it, but didn't insist on it. Yes. Very briefly, back on the public policy argument, there was an ISBA opinion that was that the ISBA opinion is a statement of the law of Illinois. We do argue, however, based on the First National Bank and Bend cases that ISBA opinions are a valuable source of public policy guidance for the court and ought to be taken into consideration and should have been here. Don't those opinions, or at least my reading, what do I know? My reading was that they suggest, strongly suggest that these agreements, nothing wrong with an agreement like this, but it should be in writing. Right. Protect both sides. Exactly. Thank you, Your Honor. Thank you, counsel. Thank you. 11 years and no statement, no written document, how can that be? Tell me your name again. Oh, I'm sorry. David Epstein for the plaintiffs. Mr. Epstein? Yes, sir. What do you say? I mean, 11 years, wasn't it? Roughly? 89 to whatever. 89 to the end of 2000. And I'm sorry, your inquiry was no writing as to... As to the fee arrangement. Happens all the time. Do you think that's good practice? Do I think it's good practice? I don't think it's the best practice. I do think it's common practice. And I think it has been common practice for many, many years. And of course, what's interesting is that when, particularly in marital cases, when the legislature got around to regulating this aspect, the requirement for a writing, it did not do so generally. It did so only for the purpose of Section 508 fee hearings in the marriage court, in the divorce court. Better to call it marriage court, it's more optimistic, but it's the divorce court. There is simply no question that the oral agreement for fees is perfectly legal. That's true, but if you had, back to Justice Karnazes' question, if you had had a writing, we probably wouldn't be here arguing this case, right? I mean, I think the resolution would certainly have been more straightforward, wouldn't it? It absolutely would have been more straightforward, but given the history of this litigation, the antecedent divorce litigation, this litigation, which took place, it's now 22 years that this litigation has been in the, the Richardson case has been in the courts, and nothing, nothing, not one motion in any of this litigation has been easy. Everything was fought tooth and nail, and now we have, despite trying this case, and, and I will concede to this court, as I have conceded to my clients, that we were wrong in seeking for three years to maintain this case as an equity case and to avoid the contract claim, to avoid a jury. I mean, I'll be very candid with the court. We were afraid, very much afraid, that a jury would say a pox on both your houses, but the jury didn't. They heard the evidence. They heard the evidence of the contract. They heard the evidence on undue influence. They were instructed, instructed, that undue influence must be rebutted by clear and You wouldn't know that this case was tried for almost a week to a jury, and the jury came back with a perfectly rational, sensible verdict. Can you address that question? Counsel, counsel has suggested that it's not, I guess, not rational or something, a compromised verdict? You do not. You clearly, whatever you have here, this doesn't even come close to a under the case law, is where, and it's a judgment call always for the court, is where a close question of liability, where the court feels that it's a close call, the jury could go either way, or it's a very weak claim of liability, and the damages are irrationally low so that the inference that arises between a questionable liability and an irrationally low damage is that there was a compromise between the liability and the damages. You don't have that here. You have a, not a 100 percent verdict, but you have a 90 percent plus verdict here, and you have, with all due respect, a pretty clear liability issue. Well, not exactly. There was about a $500,000 difference in the amount that the jury was asked for and the amount that they awarded. What the jury awarded, clearly, was the full 9 percent up to the time that the, each of the three lawyers, which occurred at different points in time, was paid the principal of their fees. And then the jury, and if you look at the numbers off of the charts, it's to the penny. The jury then awarded 5 percent after the principal was fully paid on the accrued interest. That's what the jury did. And it's to the penny. It's not like you have to guess here. If you run the numbers, which we did afterwards, we tried to figure out what the jury did, and it was very clear. You have the numbers up. It's to the penny. So that's what the jury did. And it's not everything we asked for, but it's a pretty full verdict. So you don't have anything, there's no irrationality here, and there's no insensibly low verdict that would even suggest a compromise. You don't have a compromise here. And you have a special interrogatory here. The jury found the contract. Mrs. Richardson's defense at this trial was really one thing. She said there was no agreement, which, of course, would have you then have to believe that these lawyers stuck around for 11 years and worked for nothing, trying to get some fees from the husband along the way, and all the while their client is getting $320,000 a year in maintenance from her husband and not paying them a dime. That's what you have to believe. The jury didn't. And with all due respect, it is not for this court to upset this jury verdict on any of the grounds here. I would like to briefly address two or three things on the law. Because what you have here is they attack the contract and the jury verdict on three grounds. The public policy ground, with all due respect, is absolutely groundless. The ISBA opinions do not say what they claim. The ISBA opinions are not a source of Illinois public policy any more than a law review article written by a law professor might persuade a court. But it's not law, and it's not policy. Secondly, their whole argument, oh, and by the way, just so we don't forget, there's not one case, not one judicial pronouncement that we have found or that they have cited that says that an attorney-client agreement must, for interest, must be in writing. Not one case. Zero. The same thing is true. Counsel, don't you agree that that would be a better policy? Had this been in writing, as I said earlier, you know, you would probably not be here making the same argument. Well, I wouldn't be here making the same argument. I understand that you're making, that you're arguing your point, but I wouldn't get too far down the road that, you know, it's okay not to have these agreements in writing because I don't know whether that's true or not. Well, Your Honor, I would submit to the court that I agree with Your Honor that it would have been better, and today it would be better if it were in writing. I don't think it is a legal question. I think it is a question of sound practice. I don't think it's legal or ethical, and not one case has been cited to this court which suggests that it is mandatory. Not one. Nor is there a Supreme Court rule, which there might be, but there isn't. The same thing is true of the issue, and really the whole rebuttal of undue influence comes down to one argument, in this case, that the, and the court inquired of my worthy opponent on this issue, is there a requirement, requirement, mandate, that a client who's negotiating a new fee agreement with their existing lawyer must have independent advice from a lawyer or from a non-lawyer? And the answer, very simply, is no. There is no such case. Not one. In this case, the appellants rely on the Illinois Supreme Court's Pagano decision in 92, but Pagano found a rebuttal without independent advice, clearly holding that it's not a requirement. This court, First District Appellate Court, has multiple times, and we didn't cite them, but subsequent to Pagano, you've got Justice Freeman, when he sat on this court, in Anderson v. Sconza in 89. He doesn't say it's mandatory. He found, on an appeal, he affirmed a summary judgment rebuttal without independent advice. Zachary v. Mills in the Fourth District in 1996. Mrs. Justice Garman, when she was sitting on that appellate court, to the same effect, not required. In this case, in this court, Lustig v. Horn in 2000, the late Justice Hartman, highly respected member of this court, wrote the same thing. It's simply not required. So let me be clear. The instruction issue in this case, the one, I might say, the one genuine issue in this case, the first part, you have two parts, as I think Justice Harris identified. You have two parts of that instruction, and they're inconsistent. The first part, saying the mandate on which they rely, is simply wrong as a matter of law. Illinois law does not require, require. It's a good idea. It's a good idea if you suggest it. But our courts have even said that the lawyer is not obligated to recommend. Although, I would certainly agree, I'm guessing Justice Cunningham would say, isn't that the better practice? And it absolutely is. But it's not mandatory. And it is not an obligation that would call for this verdict to be reversed. Finally, counsel makes a point, tries to make a point, about the 95 petition, and he claims there are judicial admissions. There are no judicial admissions on the interest in this case. There is no sworn statement by any of these plaintiffs anywhere that says that interest was not to be charged. It doesn't exist. What counsel is trying to do is elevate silence on an issue that, for tactical reasons, was not raised at that point in time, and convert that into a judicial admission. It's not. But even if it were, his final argument on this point was, well, it's stronger evidence. Well, you know, they had the chance to argue that to the jury. That's the jury's province as to what's the better evidence. And the jury found there was an agreement to pay interest. Bring your arguments to a close, counsel. Your Honor, I think my argument is at close. There's just two things that may escape the Court's attention. They're buried in here. We're looking back on this case, on the events of this agreement 22 years later. Let us not forget, and it's in the record, 22 years ago, when she promised 9% interest and she'd pay them at the end of the case, the prime rate was 10%. She agreed to pay them less than the prime rate. Now here we are 22 years later. Nobody thought at the time that this case was going to go 11 years. A year, two years, three years. They knew they had to go to the appellate court. Nobody thought 11 years. So back when the petition was written, and, you know, the original fee petition was in 93. It was at the same, or excuse me, back in 90. Mr. Epstein, bring your remarks to a close, please. This was not an issue then. It is an issue now. The jury passed on it, and we ask this Court to affirm. And then you don't have to reach the cross-appeal. Thank you. Brief rebuttal, counsel. Emphasis on brief. Understood, Your Honor. Okay. As to the IPI inconsistency, there's no inconsistency. The opportunity to obtain advice language is in the paragraph describing what a jury may consider in determining whether there is undue influence. Undue influence is only one element out of the three that must be rebutted, first being fairness, second being the undue influence, and third being had independent advice. There's no inconsistency whatsoever. Second point, with respect to the maintenance issue, it was very clear in trial in the testimony of Mr. Zerla, one of the plaintiffs, record site, page 508, that Mrs. Richardson could not use her maintenance to pay her legal fees because that maintenance was coming from Mr. Richardson already. If she used her maintenance, the Court determined maintenance to pay legal fees, Mr. Richardson's lawyers could have gone to the Court and say, she doesn't need this for her maintenance, for her monthly living expenses. She's using it to pay her lawyers, and they would have cut her maintenance. That was Mr. Zerla's testimony as to why he was wrong when he initially thought that they could use the maintenance. And they've been arguing that throughout the case, and they've been at odds with their own client. Every case, including the Pagano case, says that the standard is that the client had independent advice. The Pagano case, you'll remember, the client in that agreement was agreeing to an order, a court order in which the independent judge reviewed, analyzed, and determined that the order regarding fees was a fair agreement. So that was even better than having some private independent lawyer comment on the fairness of the transaction. You had a judicial approval of that agreement. If they had done that in this case, we certainly wouldn't be standing here today. That concludes my rebuttal. Thank you. Thank you very much. Thank you, sir. Counsel for spirited argument, this matter will be taken under advisement.